# FILED

**November 18, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

JOSEPH LARRY KEASLER,            )
                                 )
    Plaintiff/Appellant,         )        Appeal No.
                                 )        M1998-00228-COA-R3-CV
v.                               )
                                 )        Davidson Circuit
SALENA D'ANN KEASLER SWAIN,)              No. 92D-3394
                                 )
    Defendant/Appellee.          )

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE DAVIDSON COUNTY CIRCUIT COURT

AT  NASHVILLE, TENNESSEE

THE HONORABLE MURIEL ROBINSON, JUDGE

JAMES ROBIN McKINNEY, JR.
One Washington Square, Suite 103
214 Second Avenue North
Nashville, Tennessee 37201
        ATTORNEY FOR PLAINTIFF/APPELLANT

D. SCOTT PARSLEY
Barrett, Johnston & Parsley
217 Second Avenue North
Nashville, Tennessee 37201

ATTORNEY FOR DEFENDANT/APPELLEE

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED

WILLIAM B. CAIN, JUDGE

O P I N I O N

This is a post-divorce proceeding involving the custody of a six year old child. The trial court dismissed the Father's petition for a change of custody, awarded a child support arrearage judgment against the Father and assessed attorney fees against the Father. The Father now appeals the trial court's decision. While we affirm the court's award of child support arrearage, we reverse on the issues of custody and attorney fees.

Joseph Larry Keasler ("the Father") and Salena D'Ann Keasler ("the Mother") were divorced on grounds of irreconcilable differences by decree of the Davidson County Circuit Court on June 22, 1993. The divorce decree adopted the agreement of the parties which required the Father to pay the Mother $48 per week in child support for their child, Bridget Nichole Keasler, who was then less than two years of age. The agreement further provided as follows: "The parties acknowledge that they are the natural parents of (1) minor child, namely: Bridget Nichole Keasler, born September 20, 1991. The parties agree to share joint care, custody and control of the minor child of the parties with the child living primarily with the wife; and the husband shall have visitation with said child at reasonable times and places."

On May 29, 1997, the Father filed a petition for change of custody and contempt followed the next day by an amended petition for change of custody and contempt in which he sought a restraining order to prohibit the Mother from

interfering with his possession of Bridget pending further orders of the court. On May 30, 1997, based upon the allegations of the sworn amended petition, Judge Robinson issued the temporary restraining order. On August 25, 1997, the Mother filed an answer to the amended petition for change of custody together with a counter-petition asking that she be awarded sole custody of Bridget and that the Father be held in contempt of court.

After several motions and interim proceedings, the trial was heard January 26, January 27 and February 10, 1998. Midway through the proceedings below, Judge Robinson made the following observation: "I think I'm finding that both of them are unstable and immature. They don't conduct themselves properly in the presence of this child. I really don't have much to choose from here." At the conclusion of the trial, the court granted a Rule 41.02(2), Tenn. R. Civ. P., motion filed by the Mother in an order providing in part:

> 1. The Court further finds that the [F]ather in this matter has not been honest with the Court especially as it relates to the Temporary Restraining Order.
> 2. The Court ORDERS that the child will remain temporarily in the custody of the Father until the school year ends, at which time custody and possession of the child will be returned to [the] Mother.

At the conclusion of the February 10 hearing, the trial judge made the following statement from the bench:

> I'm going to grant his motion mainly because this side of the room was not honest with The Court, and I'm very much made aware of that. I'm going to be cognitive of it from this point on. I'm going to order that this child will remain temporarily in the custody of the [F]ather, until school ends, and then the child will be returned to the [M]other.
> She will be awarded a judgment of $9,840 in back child support. I'll reserve any payment on that until the child is returned to the [M]other the first of June. He will have every other weekend and 30 days in the summer, which can be the month of July. I'll entertain attorney fees and sanctions in this regard.

With all deference to the trial court, this adjudication subordinates the interest of the child to the trial court's revulsion to the dishonest conduct of the Father. The

trial court very properly took offense when allegations of the amended petition of the Father, made under oath and forming the basis for the trial court's issuance of a temporary restraining order, were established by the proof to be essentially false allegations. However, it is well established that the welfare and best interests of the child are the paramount considerations in determining custody. *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997).

The standards under which the adjudication should be made have been stated by this court.

> In recognition of the importance of stability and continuity, custody and visitation decisions, once made and implemented, are res judicata upon the facts in existence or reasonably foreseeable when the decision was made.
> Notwithstanding the importance of stability and continuity, intervening changes in a child's circumstances may require modifying an existing custody and visitation arrangement. Tenn.Code Ann. § 36-6-101(a)(1) (Supp.1997) empowers the courts to change custody "as the exigencies of the case may require," and courts will change custody when the party seeking to change custody proves (1) that the child's circumstances have materially changed in a way that could not have been reasonably foreseen at the time of the original custody decision, and (2) that the child's best interests will be served by changing the existing custody arrangement.

*Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. App. 1997) (citations omitted). Accordingly, we must first determine from this record whether the circumstances of the child have materially changed in a way that could not have been reasonably foreseen at the time of the final decree of divorce and custody, June 22, 1993.

The great majority of the testimonial record consists of the testimony of the Father and of the Mother, who was called as a witness by the Father. From the record, it was established that the child, Bridget, six years old at the time of the hearing, had very little stability in her life between the time of the divorce decree of June 22, 1993 and the period immediately preceding the hearing in January and February of 1998. In August 1993, the Mother gave the child, then less than two

years of age, to the Father and moved to Texas for six months. Fortunately, the paternal grandmother was available to care for the child. The Mother then returned from Texas and resided with a man named Dedmon for a short period of time. Then she resided with the Father for a period of time before moving into an apartment with a female co-worker. After moving in with another man for a short period of time with the minor child, the Mother removed the child from Tennessee to Orlando, Florida to live with another man. She then began dating Brian Swain, whom she married in November 1996, after giving birth to his child in September 1996. On November 17, 1996, while the Mother was intoxicated in the presence of the minor child, Swain was arrested for assault upon the Mother.

During most of the time between the divorce decree and the custody hearing in early 1998, the Mother worked in a series of establishments in the adult entertainment business. While in the custody of the Mother, the child never saw a dentist and the Mother could not recall how many separate day care facilities the child had attended. Also, while in the Mother's custody, the child attended J. E. Moss Elementary School for kindergarten, receiving poor grades, having excessive absenteeism and having behavioral problems.

About March 1, 1997, Bridget went to live with the Father. While the foregoing recitation of facts indicating instability in Bridget's life caused by the action or inaction of the Mother is serious, this is somewhat counter-balanced by the less than ideal conduct of the non-custodial Father. He was badly delinquent in his child support and he had his own live-in companions. The apparent periodic haven of refuge for Bridget was her paternal grandmother.

When Bridget moved in with the Father around March 1997, he was living with Karen Peterson. Two months after Bridget moved in with the Father, he filed his petition and amended petition for change of custody seeking and getting a restraining order against the Mother. The allegations he made to justify a restraining order consisted of nothing except a detailed recitation of matters that he had known

about for months.  Had the trial judge known the truth, doubtless the restraining order would not have been issued.  Likewise, the Father conveniently forgot to tell the trial judge at the time he asked for the restraining order that he was living with the child and Ms. Peterson without the benefit of marriage.

In spite of these shortcomings of the Father, it is clear from the testimony of school teachers and school personnel of the Rutherford County School System that Bridget experienced a complete turnabout in school once she started living with the Father.  Her teacher, Denise Reed, testified:

> Q.     Ms. Reed, how is she doing in school?
> A.     She was what I would consider a solid student.  She was always prepared for class.  She always had her homework a day early.  Her reading, she was on level for reading and on level for all of her subjects.
> Q.     Did she have any discipline problems?
> A.     No, sir.
> Q.     Well behaved?
> A.     Typical first grader.
> Q.     Have you ever had meetings with Mr. Keasler or his present wife about Bridget, her school work?
> A.     They came if it was conference times and just the average thing. I never had to call them in or anything.
> . . .
> Q.     How did they react about Bridget's education?
> A.     I would consider them very dedicated.  Like I said, Bridget always had her homework.  It was always due on Wednesday, but it was always turned in on Tuesday.
> Q.     Was she well dressed?
> A.     Yes, sir.
> Q.     Appear to be fed every day when she came to school?
> A.     Yes, sir.
> Q.     Did she appear to be well taken care of?
> A.     Very well taken care of.

Subsequent to May 30, 1997, the Father and Karen Peterson married and, at the time of trial, they were living with Bridget at 180 Stones River Lane in Murfreesboro, Tennessee.  Karen Peterson is a Middle Tennessee State University graduate working as an administrative assistant at Audio Video Concepts.

The Father has carried his burden of proof to establish a material change of

circumstances involving Bridget that could not have reasonably been foreseen at the time of the June 22, 1991 custody decision. *McDaniel v. McDaniel*, 743 S.W.2d 167, 169 (Tenn. App. 1987). Now it must be determined if it is in the child's best interest that custody be changed to the Father. The observations of the trial court about the immaturity and instability of both of these parents are clearly born out by the record in this case. In this comparative fitness analysis, we must seek, as did the court in *Gaskill v. Gaskill*, 936 S.W.2d 626 (Tenn. App. 1996). We are not faced with a choice between parents who have displayed sound parenting judgment in the past, but rather a comparison between two young parents who have displayed the imperfections of people lacking in maturity and stability. The record shows that the Father, despite all of his faults, is comparatively a more fit custodial parent for Bridget. Since the child was an infant, the Mother has moved from place to place and from companion to companion with less than adequate regard for the welfare of Bridget. In so doing, she has failed to provide Bridget with a stable, consistent environment. The Father, on the other hand, seems to have finally settled into a marriage and environment, bringing the kind of stability and continuity that is so essential to the well being of a small child. *See Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993). This stability is manifested by the change in Bridget's performance in school, both academically and behaviorally.

It is noted that this case was decided below on a Rule 41.02(2) motion and thus dismissed at the conclusion of the Father's proof. It is, however, conceded by counsel for the Mother, that the Mother would have offered no additional proof since the Father called the Mother as a witness in the case. The judgment of the trial court with regard to custody is reversed, and custody of Bridget is granted to the Father, Joseph Larry Keasler.

The evidence in the case supports the child support arrearage judgment in favor of the Mother in the amount of $9,840.00, and this is not seriously contested on appeal. The action of the trial court in this respect is affirmed. Finally, the Father complains of the attorney fees award in the amount of $2,500.00 made by the trial

court. In view of the finding by this court that the Father's petition for change of custody is well taken, the judgment for attorney fees will be reversed.

The judgment of the trial court is reversed as to the custody award, affirmed as to the judgment for child support arrearage against the Father and reversed as to the award of attorney fees. The case is remanded for such other proceedings as are needed consistent with this judgment. Costs of appeal are assessed against the appellee, the Mother.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:

_____
BEN H. CANTRELL, P.J., M.S.

_____
WILLIAM C. KOCH, JR., JUDGE